# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DANNY BREWER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV 13-471-RAW-SPS |
| | ) | |
| DEANA GILROY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This action is before the court on the defendants' motions to dismiss and the court's own motion to consider dismissal of the case as frivolous under 28 U.S.C. § 1915. The court has before it for consideration plaintiff's amended complaint (Dkt. 6), the defendants' motions (Dkt. 53, 63), and two special reports prepared at the direction of the court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (Dkt. 52, 61).

Plaintiff, an inmate in the custody of the DOC who is incarcerated at Oklahoma State Penitentiary (OSP) in McAlester, Oklahoma, brings this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations during his incarceration at OSP and Davis Correctional Facility (DCF), a private prison in Holdenville, Oklahoma. The DCF defendants are Sergeant Deana Gilroy, Corrections Officer Pavtukevick, Warden's Administrative Assistant Jimmy Martin, Captain Riddle, and Officer Pinley. Plaintiff also has named the following OSP officials: Deputy Warden Art Lightle, Warden's Assistant Terry Crenshaw, Unit Manager William Taylor, Case Manager Shearwood, and H-Block Security Supervisor Lt. Parker. In addition, plaintiff is suing certain DOC officials: Former DOC Director Justin Jones, Director's Designee Mark Knutson, and Internal Affairs Officers Randy Knight and Ken Yott.[1]

---

[1] To the extent the OSP and DOC defendants are sued in their official capacities as officials of the State, plaintiff's claims are barred by the Eleventh Amendment. It is well settled that a damages suit against a state official in his official capacity is merely another way of pleading an action against the State. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). *See also Will v.*

Plaintiff sets forth the following claims:

Count I: Sexual abuse or rape of a prisoner by staff is, by definition, an Eighth Amendment violation.

Count II: In violation of the Eighth and Fourteenth Amendments, prison authorities showed deliberate indifference and even overt hostility when plaintiff reported being raped.

Count III: In violation of the Fifth and Fourteenth Amendments, prison and DOC authorities were motivated by racial discrimination when they acted with deliberate indifference and overt hostility.[2]

**DCF Claims**

As an initial matter, the court directed plaintiff to serve Defendants Deana Gilroy, Pavlukevick, and Jimmy Martin in accordance with Fed. R. Civ. P. 4(m). (Dkt. 60). The United States Marshals Service was unable to serve these defendants, however, because plaintiff failed to provide current, proper addresses for them. (Dkt. 72, 73, 74). Therefore, these defendants are DISMISSED WITHOUT PREJUDICE from this action.

Plaintiff alleges that from June 2011 through January 2012, Defendant Deana Gilroy was assigned to the shower and exercise yard crew that consisted of three men and one woman. Plaintiff and Inmate Williams were cellmates and orderlies for the Echo-Charley Quad. Plaintiff alleges that Gilroy would come onto the Quad, go into the staff office, and wait until Defendant Pinley left the office or Quad. Gilroy then would call plaintiff into the staff office, where they hugged and kissed. Plaintiff had Williams watching to see that no one walked in on them. On some occasions Gilroy came onto the Quad and called plaintiff into the staff office where she would stick her hand into his pants and grope his penis, while Williams kept watch. From June 2011 through November 2011, Gilroy came at lunchtime daily to meet plaintiff in the office and talk about her personal life and how unhappy she was

---

*Michigan Dept. of State Police*, 491 U.S. 58, 71 (1988) (state officials sued in their official capacities are not "persons" for purposes of a § 1983 suit, because the suit is against the official's office and not against the official).

[2] Plaintiff lists an identical claim in Count IV. (Dkt. 6 at 17).

2

in her marriage. Plaintiff attempted to encourage her by giving her letters, poems, and gifts, which she took home in her shoulder bag. During that time period, Gilroy allegedly performed oral sex on plaintiff in a cell on the Quad. When plaintiff attempted to stop giving Gilroy letters and gifts, she became very angry and threatened to have him fired from his orderly job and to stop his transfer package. In November 2011 Inmate Williams told plaintiff that Gilroy had threatened him and said that plaintiff needed to fix his relationship with her. Williams requested a cell move and was moved two weeks later. Plaintiff was fired from his orderly job without being given a reason, and he was moved to another cell on the Quad.

On or around November 10, 2011, Gilroy received a promotion to Sergeant and was moved from the shower and exercise yard crew. She began working the midnight shift from 6:00 p.m. to 6:00 a.m. as the Echo-Charley Unit Shift Supervisor. Plaintiff claims she used any excuse to come onto the Quad where he was housed, such as escorting the nurse or passing out canteen items. She also assigned herself to the Quad when the facility was short-staffed. When she was on the Quad, she would stop by plaintiff's cell and tell him she needed to talk with him, so he should be awake and waiting for her around 1:00 or 2:00 a.m. She then would come to plaintiff's cell during the night, where they mostly talked about her marriage. He again gave her letters and poems. She also looked through plaintiff's bean hole, spoke suggestively, and watched him masturbate.

In December 2011 Inmate Ware pretended to be asleep while he listened and watched their activity. The next day Ware reported it to Defendant Pinley, but Pinley did not report the incident to the supervisor, violating Corrections Corporation of America's rape policy. On December 26, 2011, plaintiff told Defendant Pavlukevick, the Echo-Charley Quad Corrections Officer, that Gilroy was guilty of sexual assault and rape of a prisoner. Plaintiff related the incidents to Pavlukevick and asked that they be reported to Gilroy's supervisor. Instead, Pavtukevick told Gilroy, and she confronted plaintiff and denied trying to stop his transfer package or having him fired from orderly job. She advised him to stop talking and

3

relax.

At approximately midnight on January 2, 2012, plaintiff allegedly was moved to lock-up for having written letters to Gilroy. He was taken to Defendant Riddle's office where he told Riddle that Gilroy raped and sexually assaulted him when he was an orderly, and Inmate Ware previously had reported it to Defendant Pinley. Riddle, however, did not file a report with the Internal Affairs officers about plaintiff's allegations.

On January 4, 2012, plaintiff was in maximum security lock-up on Fox Unit. Echo-Charley Unit Manger Barlow and the new Deputy Warden came to investigate why he had been transferred there. The Deputy Warden was not aware of plaintiff's allegations of rape and sexual assault, so plaintiff told him about the incidents. On January 7, 2012, plaintiff filed a Grievance to the DCF Administrative Review Authority (ARA), requesting an investigation and threatening a hunger strike. The ARA's response stated there would be an investigation of the rape accusation against Gilroy.

On January 9, 2012, plaintiff was taken to the medical unit for a rape test. That same day Defendant Jimmy Martin, the Warden's Assistant, came to plaintiff's cell and said plaintiff could be transferred to another facility on the next Friday, if he stopped his hunger strike. During the conversation, however, plaintiff learned that Martin was planning to transfer him to OSP. Plaintiff said he would not stop his hunger strike until he learned the results of the rape investigation against Gilroy.

Next, the DOC Internal Affairs Department came to interview plaintiff, but the officer allegedly showed racial bias toward him. The officer began the investigation by telling plaintiff, "I have read your grievance and that [sic] I don't believe anything that you said." (Dkt. 6 at 15). The officer, however, said he was giving plaintiff a chance to convince him that he was not lying about being raped. Plaintiff offered to take a polygraph examination, but the officer said he would not administer one. The officer also told plaintiff he had received several notes from offenders on Echo-Charley Quad stating Defendant Gilroy had brought plaintiff tobacco and a cell phone. Plaintiff related that on December 23, his

4

cellmate told Officer Pinley what he had witnessed. Plaintiff also told the officer that he had told Officer Pavlukevick about the rape. In addition, he reported that an African-American officer told him that he heard Pavlukevick tell Captain Riddle about the rape accusations.

The Internal Affairs officer said that Gilroy was scheduled for a polygraph examination at the Holdenville police station that evening. Plaintiff asked if he could return to the Echo-Charley Quad cell during the investigation, but he was informed that the officer would recommend his immediate transfer to OSP.

Plaintiff returned to lockup on the Fox Unit where Warden's Assistant Martin attempted to convince him to end his hunger strike. Plaintiff refused, so around 1:30 p.m. on January 9, he was moved to the medical unit and placed on suicide watch. On the seventh day of the hunger strike, the head psychologist came to talk with him. Plaintiff explained he was refusing to eat because he thought the prison officials were conspiring to transfer him to OSP and to sweep his rape allegations under the rug. He thought the conspiracy was based on his being African-American and Gilroy's being a white female corrections officer.

The psychologist stated he would talk with Internal Affairs to find out the progress of the investigation. Later that day, the psychologist returned and told plaintiff that the Internal Affairs officer said he believed Gilroy was guilty of something, and plaintiff's former cellmate Inmate Ware and Inmate Williams would be interviewed that day. Plaintiff decided to resume eating.

After plaintiff was returned to lockup, he learned from Inmates Washington and Owen, two African-American inmates, that Gilroy had been cleared of all charges, and plaintiff was being sent to OSP. Also, the African-American officer had not been interviewed, nor were any of the correctional officers who were aware of the rape allegations. Plaintiff claims the Internal Affairs officer conspired with Defendant Jimmy Martin to transfer plaintiff to OSP. Martin told plaintiff that Defendant OSP Deputy Warden Art Lightle would personally deal with plaintiff.

DCF Defendants Pinley and Riddle allege plaintiff has failed to exhaust the

5

administrative remedies for any of his claims against them. (Dkt. 53). "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed. *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). In deciding a motion to dismiss based on nonexhaustion, the court can consider the administrative materials submitted by the parties. *See Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003), *abrogated in part on other grounds*, *Jones v. Bock*, 549 U.S. 199 (2007).

According to DOC Policy OP-090124, "Inmate/Offender Grievance Process," an inmate first must attempt to resolve his complaint informally. If that is unsuccessful, he may submit a Request to Staff (RTS). If the complaint still is not resolved, he then may file a grievance. If the grievance also does not resolve the issue, the inmate may appeal to the Administrative Review Authority or the Chief Medical Officer. The administrative process is exhausted only after all of these steps have been taken. The CCA/DCF Grievance Policy 14-5 also requires an inmate first to attempt resolution of an issue through informal procedures before filing a formal grievance. If the grievance fails to resolve the issue, the inmate should submit an appeal to the warden for final resolution.

Both DOC and CCA/DCF policies provide a specific remedy to an inmate in the event of failure of staff to respond to a RTS. Pursuant to DOC policy, if there has been no response within 30 calendar days of submission, the inmate may file a grievance to the reviewing authority with evidence of submitting the RTS to the proper staff member. The grievance may assert only the issue of lack of response to the RTS. Likewise, CCA/DCF

6

policy states that grievable matters include individual staff and inmate actions, including the denial of access to the informal resolution or grievance policies.

According to the affidavit by Terry Underwood, the DCF Grievance Coordinator, plaintiff filed three grievances at that facility from October 2011 until his transfer to OSP in March 2012. (Dkt. 53-2): Grievance 2012-1001-0026, Grievance 2012-1001-0162, and Grievance 2012-1001-0221. Only the first one concerned the allegations in his complaint, with the other two were related to property issues.

Plaintiff filed Emergency Grievance No. 2012-1001-0026 on January 5, 2012, setting forth his claims of sexual abuse and rape against Officer Gilroy. His requested action was, "All I want is for S/O Gilroy to be investigated and the witnesses that I mention be questioned." (Dkt. 53-3 at 2). In the Grievance narrative plaintiff set forth the following about Defendant Riddle: "The next thing I knew was that Captain Riddle was at my cell door three weeks later telling me to cuff up because S/O Gilroy had said that I gave her a letter and I was being charged for Menacing!" (Dkt. 53-3 at 5). Regarding Defendant Pinley, the Grievance stated, "Inmate . . . Ware talked to S/O Gilroy after C/O Pinley came to him and told him that S/O Gilroy was saying things to him (Pinley) about me, and S/O Gilroy denied ever talking to C/O Pinley about me at all." (Dkt. 53-3- at 5).

The January 6, 2011, response to the grievance stated "[t]he appropriate authorities have been notified and an investigation has begun." (Dkt. 53-3 at 4). Further, plaintiff's request (1) "for SC/O Gilroy is GRANTED, and (2) for the witnesses to be questioned is GRANTED." *Id*.

According to the record, plaintiff clearly did not exhaust the administrative remedies for his claims against Defendants Riddle and Pinley. Grievance No. 2012-1001-0026 did not assert that Riddle or Pinley violated plaintiff's constitutional rights as alleged in the complaint. Therefore, Defendants Riddle and Pinley are DISMISSED WITHOUT PREJUDICE from this action for plaintiff's failure to exhaust the administrative remedies for his claims against these two defendants.

7

**OSP and DOC Claims**

Plaintiff alleges the OSP administration is comprised of white males, and there is a history of their racial discrimination against African-American offenders. He further claims that Defendants Art Lightle, Terry Crenshaw, and William Taylor are not following the Offender's Disciplinary Procedure with respect to him because of racial discrimination.

According to plaintiff, from the moment he arrived at OSP on March 4, 2012, he has been subjected to overt racial discrimination from Defendants Lightle, Crenshaw, and Taylor. Upon arrival, he was placed in a cell with no lights inside, just holes in the wall where the lights had been. He was not given a mattress or bedroll and was wearing boxer shorts. At lunch time Correctional Officers Sgt. Hammell and Crenshaw, who is the son of Warden's Assistant Terry Crenshaw, provided food to him, but at dinner plaintiff did not receive anything to eat. The toilet and the sink faucet in his cell did not work, and he was forced to lie on cold concrete, with the smell of urine and feces surrounding him. Plaintiff got up and covered the window in the cell door, so the staff could not see him when they performed their count.

Sgt. Hammell called Shift Captain Kennedy, who removed the paper in the window and asked plaintiff why he had done it. Plaintiff told him the corrections officer was not feeding him, his cell smelled like urine and feces, and nothing worked in the cell. Kennedy checked the cell and moved him to another cell that also had no lights, but the plumbing worked. Plaintiff asked Kennedy for something to eat, and Kennedy said the kitchen was closed for the night, but he would check into why plaintiff had not received his meals. Plaintiff claims that after that night he went seven full days and nights without food, until Sergeant Boowey, an African-American officer, came to his unit. On March 12, 2012, plaintiff banged on the window in his door and got Boowey's attention. Plaintiff asked why the white correctional officers would not give him food. Boowey answered over the cell intercom and said it had something to do with why plaintiff was sent to OSP. Boowey said he would investigate, and about 30 minutes later he told plaintiff over the cell intercom that

8

Deputy Warden Lightle had placed plaintiff on a seven-day sack lunch restriction, but the kitchen was not aware of the restriction. Plaintiff received his lunch that day on Sgt. Boowey's shift.

The next day, while plaintiff was being escorted to his disciplinary hearing, he told Lt. Glover in front of Sgt. Boowey that Glover's corrections officer was not feeding him. She replied that she knew plaintiff was receiving all his meals, because she watched the Quad camera and saw him get the meals. Once he was back in his cell, Sgt. Boowey told plaintiff he would get his food when Boowey was working a shift.

After Boowey was gone, however, plaintiff claims he again was denied his meals by white corrections officers. In particular he asserts that Mr. Sgt. Spears came from his post to Ms. Sgt. Spears' post to push Ms. Spears' food cart around the Quads. Ms. Spears opened the inmates' bean holes and delivered their food. When they came to plaintiff's cell, however, they would pass by and refuse to give him a meal. Plaintiff could see his sack lunch on the cart with his name on it, but it was not given to him.

After plaintiff informed Chief Peters about his not receiving meals for seven days, Mr. and Ms. Spears personally began bringing the sack lunches to him by making plaintiff stand at the back of his cell and throwing the food on the floor, where there sometimes was a puddle of water from a roof leak. Plaintiff later was moved to another area of the Quad where Mr. Spears and Correctional Officer Heartsfield worked the 6:00 a.m. to 2:00 p.m. shift. They allegedly instructed Gooseby, the Quad "run man," that he would be fired if he gave anything to plaintiff. The run man is responsible for cleaning the Quad and passing out tea, juice, milk, coffee, toilet tissue, clothing, and indigent hygiene items.

Plaintiff further complains there were no lights in his cell, and he could smell raw sewage and see it in the toilet and sink. He was not given a mattress or bedroll for another seven days, and was allowed to eat only every other day. He alleges he sent three grievances to the administrator concerning his living conditions, but there were no responses. He also claims he submitted two grievances to Warden Workman in March 2012, but Workman was

9

on medical leave, and Deputy Warden Lightle was on vacation. Plaintiff then filed a grievance to DOC Director's Designee Debbie Morton, asking for relief, but again received no response.

Plaintiff contends the white male administration at OSP is racially discriminating against him, because he is African-American and because he claimed a white female corrections officer raped him. He also claims the OSP officials are conspiring with DCF Warden's Assistant Jimmy Martin and the Internal Affairs Officers, so they can cover up the crimes against him.

Plaintiff continues with allegations that Sgt. Spears and Correctional Officer Heartsfield instructed Bradshaw, the new run man, not to give plaintiff anything. When plaintiff complained to Sgt. Taylor and Sgt. Hands, they said it was not their job to give him the items passed out by the run man. Instead, plaintiff was responsible for getting the products from the run man. Plaintiff filed a grievance to Warden Workman and claims he complied with every step to exhaust his administrative remedies.

Plaintiff further alleges that after complaining about the conditions for a full year, Unit Manager William Taylor and Deputy Warden Lightle moved him to a high max cell as punishment. He was denied food for several days and filed several Requests to Staff and an Emergency Grievance, but received no responses.

Plaintiff claims he had to write DOC Deputy Director D.B. Parker, before any of his issues at OSP were addressed. The conditions began to improve, and plaintiff began to be allowed in the exercise yard almost daily and to take daily showers. He also received three meals a day. The water faucet in his cell sink was not working, so he filed an Emergency Grievance. DOC Director's Designee's response was that the lack of water in his cell was not an emergency. Plaintiff asserts he had no drinking water in his cell for more than three months.

Plaintiff also submitted several grievances to Mr. Knutson he marked "Sensitive/Emergency," claiming he was experiencing racial discrimination from the OSP

administration. The issues, however, were not addressed. In addition, Deputy Warden Lightle and Corrections Officers Kelley and Scott used racial epithets and talked about assassinating the President, and there are no African-American corrections officers at OSP above the rank of Sergeant. Finally, plaintiff asserts that Lt. Parker on H-Block falsifies records and refuses to follow policy concerning plaintiff's yard time and showers.

OSP and DOC Defendants Terry Crenshaw, Justin Jones, Randy Knight, Mark Knutson, Jacky Parker, Keith Sherwood, William Taylor, and Art Lightle also have moved for dismissal, alleging plaintiff has failed to show their personal participation in any constitutional violations. (Dkt. 63). "Personal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (citations omitted). *See also Mee v. Ortega*, 967 F.2d 423, 430-31 (10th Cir. 1992). Plaintiff must show that a defendant personally participated in the alleged civil rights violation. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Supervisory status is not sufficient to support liability under § 1983. *Id. See also Polk County v. Dodson*, 454 U.S. 312, 325 (1981).

The court finds plaintiff has failed to identify what, if anything, Defendant Jones did that resulted in a constitutional violation. Jones is mentioned only with respect to his position as the DOC Director. Similarly, there are no allegations that Internal Affairs Officers Knight and Yott personally participated in constitutional violations against plaintiff.[3]

Regarding Defendant Lightle, plaintiff alleges he discriminated against him because of his race, placed him on a sack lunch restriction, moved him to a high-max cell, and used racial epithets. The allegations regarding plaintiff's food do not show that Lightle personally participated in the denial of meals, only that plaintiff was placed on a sack lunch restriction. Further, movement to a different cell is not a constitutional violation. *Cf. Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (holding that it is well settled that there is no constitutional right to incarceration in a particular correctional facility); *Quick v. Mann*, No.

---

[3] Defendants Knight and Yott have not been served, but an entry of appearance for Knight was entered. (Dkt. 35).

05-7012, 170 F. App'x. 588, 590 (10th Cir. Mar. 15, 2006) (unpublished) ("[C]orrections officials retain broad discretion over the administration of prisons, including housing in general and cell assignments in particular."); *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994).

Furthermore, plaintiff's allegations against Lightle and Defendant Crenshaw about racial discrimination must fail, because plaintiff has not specified any conduct by these defendants that amounts to a constitutional violation in which they personally participated. As for Defendant Taylor, plaintiff claims Taylor discriminated against him, failed to provide toiletry items, and moved him to another cell. Again, there are no details to support Taylor's personal participation in unconstitutional acts or omissions.

The only allegations against Defendant Knutson are related to the grievance process. In addition, the allegations against Director's Designee Sherwood concern Sherwood's response to plaintiff's Emergency Grievance about the broken faucet in his cell. Sherwood allegedly told plaintiff that his situation was not an emergency. Plaintiff also contends Sherwood failed to address his Sensitive/Emergency Grievance concerning alleged racial discrimination. Plaintiff's claims against these two defendants are meritless, because "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by the plaintiff, does not establish personal participation under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citations omitted).

Defendant Lt. Parker is alleged to have falsified records and refused to follow policy regarding plaintiff's yard time and showers. Plaintiff, however, has not provided any context or specific facts that would support a claim that Parker personally participated in a constitutional violation.

Based on the foregoing reasons the court finds the allegations in plaintiff's complaint are vague and conclusory, and the allegations do not rise to the level of a constitutional violation. The Tenth Circuit Court of Appeals consistently has held that bald conclusions, unsupported by allegations of fact, are legally insufficient, and pleadings containing only

12

such conclusory language may be summarily dismissed or stricken without a hearing. *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1990); *Lorraine v. United States*, 444 F.2d 1 (10th Cir. 1971). "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (citing *Brice v. Day*, 604 F.2d 664 (10th Cir. 1979), *cert. denied*, 444 U.S. 1086 (1980)).

The court authorized commencement of this action *in forma pauperis* under the authority of 28 U.S.C. § 1915. Subsection (e) of that statute permits the dismissal of a case when the court is satisfied that the complaint is without merit in that it lacks an arguable basis either in law or fact. *Nietzke v. Williams*, 490 U.S. 319 (1989); *Yellen v. Cooper*, 828 F.2d 1471, 1475 (10th Cir. 1987).

**ACCORDINGLY,** Defendants Deana Gilroy, Pavlukevick, and Jimmy Martin are DISMISSED WITHOUT PREJUDICE for plaintiff's failure to serve them in accordance with Fed. R. Civ. P. 4(m). Defendants Riddle and Pinley's motion to dismiss (Dkt. 53) is GRANTED, and Defendants Riddle and Pinley are DISMISSED WITHOUT PREJUDICE for plaintiff's failure to exhaust the administrative remedies for his claims against these two defendants, pursuant to 42 U.S.C. § 1997e(a). Furthermore, plaintiff's claims against the Department of Corrections defendants and the Oklahoma State Penitentiary defendants are DENIED for failure to show these defendants personally participated in constitutional violations. This action is, in all respects, DISMISSED as frivolous, and the dismissal shall count as a STRIKE, pursuant to 28 U.S.C. § 1915(g).

**IT IS SO ORDERED** this 18th day of March 2015.

**Dated this 18th day of March, 2015.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma